IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JOHN L. BROZ,
      Plaintiff,

vs.                              Case No. 3:07cv204/RV/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act (Act) and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits (DIB) under Title II of the Act, 42 U.S.C. §§ 401–34.

      Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.      PROCEDURAL HISTORY

      Plaintiff applied for DIB on June 4, 2003, and he was found not disabled initially and on reconsideration (Tr. 35–46, 68–71).[1]  On April 27, 2006, following two hearings, an administrative law judge (ALJ) rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Social Security Act (Tr. 16–28).  On March 20, 2007, the Appeals Council of the

---

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on August 2, 2007 (Doc. 9).

Social Security Administration denied Plaintiff's request for review (Tr. 5–7).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

II.    FINDINGS OF THE ALJ

On April 27, 2006, the ALJ made several findings relative to the issues raised in this appeal (Tr. 16–28):

1)    Plaintiff's last date of disability insurance status coverage was December 31, 2001 (20 C.F.R. §§ 404.130 and 404.131).  Plaintiff, therefore, must establish that his disability began on or before December 31, 2001, and has since remained unabated at the same disabling level of severity, in order to obtain benefits in connection with his Title II application (20 C.F.R. §§ 404.315, 404.316, 404.320 and 404.321).[2]

2)    Plaintiff has not performed substantial gainful activity (SGA) since his alleged onset of disability.

3)    Plaintiff possessed severe, functionally limiting musculoskeletal impairments, in the form of mild degenerative disc disease and osteoarthritis of the thoracic, lumbar and cervical spine and probably moderate, post-traumatic generative osteoarthritis of the right shoulder joint, prior to his date last insured.  However, Plaintiff did not possess any such impairment of the presumptively disabling level of severity described in any section listed in Part A to Appendix I, Subpart P, Social Security Regulations No. 4.  Further, Plaintiff possessed no severe medically determinable, functionally limiting mental health impairments of any kind prior to December 31, 2001.

4)    Plaintiff's allegations of chronic, debilitating pain in his spine and multiple other joints (and other related symptoms), affecting the regular functional usage of the lower torso, legs, and arms before December 31, 2001, cannot at all be considered credible to extent described.

5)    Plaintiff could not return to his past relevant work as a residential painter, which is performed at a medium level of exertion, as of his date last insured (20 C.F.R. § 404.1565).

6)    Plaintiff possessed the residual functional capacity (RFC), however, to perform a full range of the physical demands of light and sedentary exertion as of December 31, 2001 (20 C.F.R. §§ 404.1545(b) and 404.1567(a)).

---

[2]Thus, the time frame relevant to this appeal is October 31, 1996 (alleged onset) (*see* Tr. 23) to December 31, 2001 (date last insured).

7)    Plaintiff was a younger individual of 36 years of age who possessed a high school diploma as of December 2001.  He previously worked in skilled employment as a residential painter, but he likely retains no transferable work skills to other industries (20 C.F.R. §§ 404.1563, 404.1564 and 404.1568).

8)    Plaintiff was able to make a successful vocational adjustment to significant numbers of light and sedentary jobs existing in the national economy with his individualized vocational characteristics during the period between October 31, 1996 and December 31, 2001 (20 C.F.R. §404.1566(b)).  Vocational expert testimony establishes the incidence of such work in significant numbers of the national economy for a hypothetical individual similarly situated to Plaintiff in all respects.

9)    Plaintiff, therefore, has not been under a "disability" as defined in the Act at any time relevant to the present decision (20 C.F.R. §404.1520(f)).

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d

1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing SGA, he is not disabled.

2.      If the claimant is not performing SGA, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing SGA and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must

then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

A.    Personal History[3]

Plaintiff testified that he was born on November 24, 1965, which made him forty years old when the ALJ's opinion was rendered.  Plaintiff reported obtaining a high school diploma in June 1984 and described previous employment as a residential painter.  He alleged that he has been unable to perform any regular and sustained employment since October 1996, secondary to chronic pain in multiple joints, including the right shoulder, neck, knees, and back.  He attributed the majority of his symptoms to progressively severe degenerative arthritis.  He maintained that routine household chores and other similar simple types of physical activity were extremely difficult to perform due to pain.  He further complained of frequent stiffness in his upper back and shoulders, as well as frequent numbness and weakness in his hands.  He described his lower back pain as radicular in nature (that is, often radiating through the buttocks down the back of the legs to the feet).  Plaintiff contended he could "hardly" bend, stand, walk, lift, carry, or stoop without experiencing increased levels of nearly incapacitating pain.  He alleged being completely unable to squat, kneel, crawl, climb, or crouch.  He further claimed that a typical day involved lying in a reclining chair or on a sofa for six to eight hours.  He noted that he was unable to sit in one place for longer than an hour, stand in one place longer than five minutes, or walk more than fifteen to twenty minutes.  He reported having to get help for several years from his family just to put on his socks, and he alleged frequently being unable to grip or grasp with his hands.  He emphasized that his pain and other symptoms were just as severe in 2001 as they were at the time of his hearing years later.  He repeatedly pointed to a prescription for Methadone he had obtained in 2001, for relief of chronic pain, as proof of the longstanding existence of his disability.  He further claimed that his chronic pain led to depression and restless sleep.  Plaintiff testified that bulging discs in his spine and an old cervical vertebral fracture were responsible for the majority of his symptoms.  He also claimed that

---

[3]Unless otherwise indicated, information in this section and in section IV.C., *infra*, is derived from the opinion of the ALJ (Tr. 16–28).

he had a residual bone "chip" in his right shoulder as a byproduct of the surgical repair of injuries sustained in the remote past.

B.       Relevant Medical History[4]

Medical records dated March 10, 1989, indicate that Plaintiff was diagnosed with a third degree acromioclavicular ("AC") joint sprain (chronic) and AC joint arthritis on the right (Tr. 129). He had injured his right AC joint and coracoclavicular ligaments in approximately 1989 and had a recent recurrent injury.  Despite physical therapy, he continued to have pain in the AC joint for which he underwent surgical excision of the meniscus and the distal portion of the clavicle (Tr. 120).

Medical records from Luis A. Berec, M.D., dated July 3, 2001, indicate that Plaintiff initially submitted for treatment with complaints of pain in his right shoulder, legs, knees and lower back (Tr. 145).  Plaintiff stated that he was having trouble sleeping and was getting an average of only four hours of sleep per night.  He also complained of swelling in his knees, noting that his right knee popped out of place and that walking increased the pain (*id.*).  Dr. Berec's records indicate that Plaintiff had weakness and numbness in his right arm, which had increased following his right shoulder surgery (*id.*).  Plaintiff was initially diagnosed with cervical radiculitis, insomnia, fatigue, and low back pain (Tr. 146).  Dr. Berec prescribed Ambien and Celebrex and requested that x-rays be performed on Plaintiff's entire spine (*id.*).

Plaintiff returned to Dr. Berec on July 31, 2001, and reported that Ambien was helping somewhat with his insomnia, as was Celebrex with his stiffness (Tr. 140).  However, Plaintiff continued to experience pain and numbness in his right arm (*id.*).  Dr. Berec's notes appear to reflect a positive Tinel's sign and a positive Phalin's test of the right upper extremity, and Dr. Berec noted that an MRI of the cervical spine should be obtained (*see* Tr. 140).  Thus, an MRI was taken on August 15, 2001, but it revealed no abnormalities (Tr. 139).  Views of the right shoulder were also obtained on the same date, and they revealed a widened coracoclavicular space with a "peculiar smoothly corticated 1-cm bony protrusion off the superior margin of the coracoid, likely representing post-traumatic spurring" (Tr. 138).  On August 20, 2001, Plaintiff reported pain in his arm, neck, and back, and he reported that his pain had worsened (Tr.136).  Radiographic studies of

---

[4]Unless otherwise noted, information in this section is derived from Plaintiff's "Memorandum in Support of Complaint" (Doc. 11).

the cervical spine indicated anterior spurs at the C5–C6 inner space, as well as degenerative changes (Tr. 137, 139, 143).  X-rays of the right shoulder revealed a distal clavicle slight contour irregularity and deformity (Tr. 138).  The radiologist noted that "[t]he AC joint is borderline prominent in transverse width with no alignment offset" (*id.*).  The coracoclavicular space seemed widened, which likely represented a post-traumatic spurring and deformity, but no acute pathology was noted (*id.*).  An MRI of the thoracic spine revealed small anterior marginal osteophytes throughout the spine as well as anterior wedging of the T12 and L1 vertebrae (Tr. 144).  Dr. Berec refilled Plaintiff's medications and wrote a new prescription of Methadone for pain (Tr. 136).  As of August 29, 2001, Plaintiff's back pain had not changed (Tr. 132).  Plaintiff's weight was greater than 350 pounds, and his blood pressure was quite elevated.  Dr. Berec's records further indicate that on September 5, 2001, Plaintiff reported no improvement and a worsening of his pain (Tr. 131).  He was referred to two specialists by Dr. Berec for reasons that are not legible in the record (*id.*).

On September 19, 2001, Plaintiff consulted with Robert Sackheim, M.D., a pain management specialist, upon referral from Dr. Berec (Tr. 272).  Plaintiff reported having pain throughout the entire spine from the neck to the buttocks and that the pain had started years ago but had recently progressed.  His pain was described as dull and constant, and stabbing at times with tingling in his fingertips.  Plaintiff indicated that he was unable to continue the Methadone prescribed by Dr. Berec due to its side effects, which included severe gastrointestinal upset (*id.*).  Plaintiff's acromioplasty and numerous old football injuries were noted (Tr. 272–73).  Plaintiff's medications included HCTZ, Methadone, Skelaxin, Ambien, and Celebrex (Tr. 273).  Dr. Sackheim's  diagnoses were chronic cervalgia with radiculopathy, chronic low back pain, morbid obesity, sleep disturbances, right shoulder problems, and high blood pressure (Tr. 271, 274).  Dr. Sackheim recommended weight loss, cervical and lumbar epidural steroids injections, and he discontinued the Methadone and prescribed Celebrex and Ultram (*id.*).  Plaintiff did not undergo the epidural steroid series at that time, and he did not return to Dr. Sackheim.

Plaintiff testified that he ceased treatment with Dr. Berec because he left the area.  Moreover, Plaintiff had not been made aware that Dr. Berec was leaving the area until several months after his last visit with him (Tr. 412 ).  It then took several months to find a new physician that was approved by his insurer (*id.*).

Plaintiff began treating with Lourdes Virtusio, M.D., on August 8, 2002, after Plaintiff's date last insured (Tr. 198, 237).   At that time his complaints included hypertension, reflux disease, insomnia, and cervical and lumbar degenerative disc disease (Tr. 198, 238).   Plaintiff indicated that he needed refills of his medication (Tr. 198).   Dr. Virtusio prescribed Celebrex, Skelaxin and Ultracet for inflammation, muscle spasms and pain, respectively, and she ordered lab tests (Tr. 199, 238–39).  Plaintiff followed up two weeks later and reported that the Celebrex seemed to be helping his neck and low back pain.   Dr. Virtusio continued the Celebrex and Skelaxin and prescribed Darvocet (Tr. 196, 239).  Dr. Virtusio stated at nearly every office visit that Plaintiff had low back and neck pain, as well as muscle spasms (Tr. 240).   She also noted numbness and tingling in his right leg, a herniated disc, back spasms, and radiculopathy (*id.*).  Plaintiff's weight had increased to more than 350 pounds (Tr. 188–98, 241).  Dr. Virtusio stated that although Plaintiff had tried to lose weight, he was gaining weight because of his medications and depression (Tr. 241).   Plaintiff returned on August 22, 2002, at which time he told Dr. Virtusio that he "is a painter and he does a lot of repetitive hand/body movements" (Tr. 195) (emphasis added).[5]  It was noted at another office visit that Plaintiff "works as a painter" (*see* Tr. 190).

Dr. Virtusio ordered an MRI in March 2003, which showed: 1) an L3–4 central disc protrusion, 2) annular bulging of some of the disc margins at the L2–3, L4–5 and L5– S1 vertebral levels, and 3) multi-level degenerative disc disease (DDD) (Tr. 187, 242).   Additional MRIs performed on May 29, 2003 confirmed minor annular bulging in the thoracic spine and multi-level DDD from the T12 through L4 vertebral levels (Tr. 242).

On March 19, 2004, Dr. Virtusio provided a sworn statement to Plaintiff's counsel, in connection with Plaintiff's claim for DIB, in which she testified that the MRI results represented arthritis and excessive wear and tear of the joints from much trauma (Tr. 243–44).  She also stated that the degeneration or the arthritis in Plaintiff's spine was not what you would expect from someone who is 38, but more like that of a 50-year-old (Tr. 244).  She believed that the repetitive physical activities of Plaintiff past work caused Plaintiff's DDD and arthritis.  Next, Dr. Virtusio

---

[5]The notes certainly suggest Plaintiff was working as a painter at the time the notes were made, that is, in August 2002, as the notes are written in the present tense — although Plaintiff testified he had not worked as a painter since 1996 (*cf.* Tr. 198 (Dr. Virtusio's notes indicating that Plaintiff "used to see Dr. Berec") (emphasis added)).  *See also* Tr. 239 (Dr. Virtusio's testimony also suggests Plaintiff was working when he saw her in August 2002).

indicated that Plaintiff's pain was significant enough to be distracting to the adequate performance of daily activity or work, and that at times he could not function (Tr. 245, 333).  She found Plaintiff to be a credible patient with an underlying medical condition expected to cause the pain of which he complained (Tr. 244–45, 333A).  She then stated that physical activities such as walking, standing, bending, and moving of extremities would increase Plaintiff's pain to such an extent that bed rest and medication would be necessary (Tr. 246, 248, 333).  Finally, she stated that the side effects from Plaintiff's medication could be expected to be severe and limit effectiveness due to distraction (Tr. 246, 333).  She noted that Plaintiff had been prescribed Methadone before she treated him, but she did not think continuing that medication was a good idea (Tr. 247).  Rather, she prescribed alternate pain medication and referred Plaintiff to a pain management specialist (*id.*). Additionally, she opined that prolonged sitting or standing would aggravate Plaintiff's pain, and she restricted him to sitting or standing for less than one hour at any period of time (Tr. 248–49).  She reported noticing that Plaintiff constantly changed positions when he was in her office and that he had great difficulty staying in one position for more than thirty minutes (Tr. 249).  Dr. Virtusio stated that Plaintiff was unable to work on a full-time basis because of the severity of his pain (Tr. 254).  She also stated that Plaintiff's pain had worsened over the time she saw him and that it was particularly exacerbated by a fall that occurred in May of 2003 (Tr. 255–56).  Dr. Virtusio, however, could not comment on whether surgery would be beneficial for Plaintiff, acknowledging that she was "not a specialist" (Tr. 256).

Dr. Virtusio provided another sworn statement in January of 2006, after reviewing the medical records of Dr. Berec, in which she provided an opinion regarding Plaintiff's limitations prior to December 2001, the cessation of his insured status (*see* Tr. 322, 325).  Dr. Virtusio stated that Dr. Berec's records revealed cervical degenerative changes and carpal tunnel syndrome which would contribute Plaintiff's pain (Tr. 326–27).  After reviewing Dr. Berec's records, she opined that in 2001, Plaintiff's level of pain would have been as distracting and as limiting as it was during the time she treated him (that is, from August 2002 to July 2003) (Tr. 170–99, 327–28).  She further indicated that Plaintiff's underlying medical condition was consistent with the level of pain he was experiencing in 2001 and that Plaintiff would have had side effects from medication, particularly Methadone, that could have been expected to be severe and to limit his effectiveness (Tr. 328–333A).

Medical records of William Smith, M.D., an orthopedic surgeon, dated April 7, 2003, indicate that Plaintiff was suffering severe lumbar pain with radiculopathy and transient loss of bladder control (Tr. 184).  Dr. Smith noted that Plaintiff had been unable to work and was taking care of his child at home.  Dr. Smith diagnosed a disc protrusion with canal stenosis and morbid obesity and stated that Plaintiff was not a surgical candidate.  He asked Dr. Virtusio to refer Plaintiff to pain management and suggested a weight loss program to "unload the back" (*id.*).  Medical records dated May 30, 2003, from Dr. Phillip C. Benton, M.D., an orthopedic surgeon, indicate that Plaintiff was suffering a longtime history of lower back, buttock, and thigh pain (Tr. 156).  The pain was generally worse with activity, and there was some recent intermittent urinary incontinence.  Dr. Benton's impression was marked obesity with L3–4 central disc protrusion.  He recommended a conservative protocol due to Plaintiff's obesity (*id.*).  On May 14, 2003, Virgilio Barangan, M.D., a pain management specialist, evaluated Plaintiff (Tr. 158–63).  He concluded that Plaintiff's pain was coming from a combination of a central disc herniation, canal stenosis at the L3–4 level, multi-level annular bulges, and right lumbar facet arthropathy.  Dr. Barangan thought Plaintiff would benefit from lumbar epidural steroid injections and right lumbar facet blocks.

Medical records from Robert Frank, M.D., a neurologist, dated June 25, 2003, indicate that Plaintiff had chronic difficulties with his low back pain (Tr. 166).  Plaintiff told Dr. Frank that he had not worked since 1996.  His symptoms had remained relatively stable until May of 2003, at which time he fell and had an increase of pain in the lumbar region that radiated into his buttocks.  Examination revealed an antalgic gait (*id.*).  Dr. Frank suggested a nerve conduction study of the legs to rule out radiculopathy.  He concurred with continued pain management, suggested a urine culture, and felt that Plaintiff's bladder urgency should be evaluated by a urologist (Tr. 167).

Plaintiff began seeing Craig Cartia, M.D., a pain management specialist, on July 24, 2003 (Tr. 216).  Dr. Cartia's records reveal that Plaintiff's chief complaint was low back pain which radiated into the lower extremities.  Plaintiff stated that he had been suffering this pain for the past seven or eight years and had not had any specific injuries or trauma, except that he had suffered some cumulative injuries over the past years (Tr. 213–16).  Plaintiff reported that his pain became more severe in 1994, but he had put off going to the doctor until a few years ago (Tr. 216).  Plaintiff complained of pain and tingling in his legs which radiated below the knees, pain across the lower back and in the right shoulder area which was sharp, burning, and aching, and he reported difficulty

sleeping due to pain.  He also suffered muscle spasms (Tr. 213–16).  Plaintiff complained that his pain increased with sitting, standing, walking, bending, lying down, cold, heat, and weather changes. He noted that nothing specifically decreased the pain.  Physical examination revealed decreased flexion in the lower spine and tenderness to palpation throughout the cervical area, the-mid thoracic area, and diffusely throughout the lower thoracic and lumbar paraspinous regions.  Dr. Cartia's impression was lumbar radiculopathy, spinal stenosis, spondylosis, DDD, and lumbar facet syndrome (Tr. 215).  Dr. Cartia stated that Plaintiff would be a candidate for lumbar epidural steroid injections, and such injections were performed on September 4, 2003. (Tr. 208–10).

Dr. Virtusio also referred Plaintiff to Robert Jensen, M.D., a rehabilitation specialist (Tr. 277–79).  On February 1, 2004, Dr. Jensen noted a 25-year history of low back problems that had significantly worsened over the last 10 years (Tr. 277).  Incapacitating pain was noted in the mid and low back areas with severe radiation down the legs and into the feet and toes.  Epidural injections had been tried with no benefit.  Dr. Jensen's diagnoses were severe chronic lumbar discogenic pain, lumbar spinal stenosis with lower extremity neurogenic claudication, and morbid obesity and deconditioning (Tr.  278).  Dr. Jensen concluded that a formal physical therapy program would actually be more provocative to Plaintiff's pain symptoms than helpful, and he recommended that Plaintiff see an endocrinologist for medical supervision of weight loss after which he might be a candidate for physical therapy (Tr. 279).  He prescribed a trial of Neurontin 300 mg capsules, three times a day, for the neurogenic component of his pain (Tr. 251–52).  Dr. Jensen also discussed weight loss with Plaintiff and recommended that he return in six weeks (Tr. 279).

C.      Other Information Within Plaintiff's Claim File

On June 21, 2005, Richard Tyler, M.D., a board certified orthopedic surgeon, answered "Medical Expert Interrogatories" submitted to him by the ALJ (*see* Tr. 300–10).  He did not examine Plaintiff, but he reviewed Plaintiff's medical records and determined that Plaintiff suffered from obesity and DDD at all levels of his spine, as well as a disc herniation at L3–4 (Tr. 302).  In pertinent part, Dr. Tyler opined that Plaintiff's conditions did not meet or equal a listed impairment, and he concluded that Plaintiff was capable of performing work at the medium level of exertion for six hours in an eight-hour workday (Tr. 303, 305).

A supplemental hearing was held on November 3, 2005.  Multiple witnesses appeared and testified, including John Joseph Broz, Plaintiff's father; James Andrews, a lifelong friend of

Plaintiff's; Peggy Elaine Broz, Plaintiff's spouse; and Sheila G. Justice, a vocational expert ("VE"). In summary, Plaintiff's father testified that Plaintiff had experienced back and knee problems for years, mostly as a result of old injuries from playing football in high school.  He alleged that Plaintiff delayed seeing a medical provider because of a bad experience in his childhood during a spinal tap procedure.  Mr. Broz claimed his son was already in "bad shape" when he began treatment with Dr. Berec in 2001.  He corroborated Plaintiff's account regarding the need to stay on a couch for several hours following any attempt to perform such simple physical activities as washing dishes or cooking a meal.  Next, Mr. Andrews testified that he had seen Plaintiff an average of three to four times per week for the last six years.  He reported seeing Plaintiff experience extreme physical difficulty since before 2001, as a result of extreme pain in his neck, back, and right shoulder. Additionally, Plaintiff's wife testified that Plaintiff had experienced pain for many years, dating back to at least 1996 or 1997.  She emphasized that he has steadily declined physically over the years to the point where he walks hunched over with a cane for support.  She indicated that Plaintiff cannot sleep uninterrupted, walk longer than ten to fifteen minutes, or bend or stoop at all due to intense and persistent pain.  Finally, Plaintiff testified that he used to self-medicate his pain with alcohol and over-the-counter anti-inflammatory drugs, but he now receives epidural injections and daily medication.  He denied ever undergoing specific surgery on his spine, only referring to remote surgical repair on his right shoulder.

The VE was asked a hypothetical question regarding Plaintiff's ability to perform the functional demands of work as outlined by Dr. Tyler (*see* Tr. 300–15, 415–25).  She testified that Plaintiff's past vocationally relevant employment as a residential painter was skilled work performed at a medium level of physical exertion for eight hours per day.  She indicated that an individual unable to engage in such work for eight hours per day was unable to return to performing it. However, VE Justice testified that well over one million light unskilled positions existed within the national economy for any individual with the functional ability to perform a "full range" of the physical demands of light work activity.  She cited examples of such jobs as a cleaner/housekeeper and raw shell fish preparer, with 1,476,979 and 1,186,479 such jobs available in the national economy, respectively.  The VE's testimony was provided in express consideration of the Dictionary of Occupational Titles and was based on her own reported prior attempts to place other individuals of similar backgrounds in jobs while employed in the State of Florida.

Case No. 3:07cv204/RV/EMT

V.      DISCUSSION

Plaintiff raises four issues on appeal.  First, Plaintiff contends the ALJ failed to give proper weight to the opinion of Dr. Virtusio, a treating physician, and instead improperly relied on the opinion of Dr. Tyler, a non-examining source (Doc. 11 at 16–20).  Second, Plaintiff contends the ALJ erred in failing to find that his obesity was a "severe" impairment (*id.* at 20–21).  Third, Plaintiff contends the ALJ erred in rejecting his complaints of pain and other subjective complaints (*id.* at 21–24).  Finally, Plaintiff contends the ALJ erred in his consideration of the testimony of the VE (*id.* at 24–25).

A.      Weighing the Opinions of Treating Physicians and Other Sources

Plaintiff first contends the ALJ failed to give proper weight to the opinion of Dr. Virtusio, a treating physician, and instead improperly relied on the opinion of Dr. Tyler, a non-examining source.

Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* Lewis v. Callahan, 125 F.3d 1436, 1439–41 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991);  Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  "'[G]ood cause' exists when the:  (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* Edwards, 937 F.2d at 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See* Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency

with the record as a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d).  Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion.  *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the providence of the Commissioner. 20 C.F.R. § 404.1527(e).  The opinion by a treating physician that a patient is "unable to work" or is "disabled" is not dispositive for purposes of Social Security claims.  The Commissioner's regulations and the interpretations of those regulations clearly provide that an ALJ should give weight to a physician's opinions concerning the nature and severity of a claimant's impairments, but that the ultimate question of whether there is disability or inability to work is reserved to the Commissioner.  For instance, 20 C.F.R. § 404.1527(e)(1) specifically states that a finding of disability or inability to work by a medical source does not mean that the Commissioner will automatically reach the same conclusion.  Furthermore, the Commissioner "will not give any special significance to the source" of an opinion on issues reserved for the Commissioner.  20 C.F.R. § 404.1527(e)(3); *see also* Social Security Ruling 96-5p (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance").  Although such opinions on disability are not entitled to controlling weight, they must not be ignored, and the Commissioner must examine the entire record to determine whether such opinions are supported by the record.  SSR 96-5p.  In Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997), the court reversed the ALJ's finding of no disability, in part because the ALJ relied on a treating physician's report that the claimant could no longer work as a longshoreman when this report was ambiguous as to whether the claimant could do any work, and the physician subsequently wrote a letter saying the claimant was completely disabled.  To require the Commissioner to accept as controlling a statement that a patient is or is not

disabled would require the Commissioner to credit the physician not only with knowledge of the patient's physical condition, but also with an understanding of the nuances of how the regulations analyze physical limitations with respect to job experience, age, education, transferability of skills, the definitions of the various levels of exertion relevant to types of work, and similar matters. Additionally, a physician's opinion on whether a person is able to work may be colored by such things as the physician's knowledge of local hiring practices, whether there are specific job vacancies, a person's reluctance to do a particular kind of work, and similar matters. These things are not properly considered by the Commissioner in determining disability. 20 C.F.R. § 404.1566. For all these reasons, a physician's opinion that his or her patient cannot work or is disabled is not a conclusive medical opinion for the purpose of Social Security benefits determinations and by itself is not entitled to special significance.

Finally, the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole. *See* Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Oldham v. Schweiker, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981).

In the instant case, the ALJ noted that he had "fully considered the two deposition statements taken of Dr. Virtusio," the later of which contains Dr. Virtusio's opinion that Plaintiff's pain had been disabling since before his insured status lapsed (*see* Tr. 25). The ALJ, however, declined to credit Dr. Virtusio's opinion, and he provided several reasons for declining to do so. First, the ALJ noted that Dr. Virtusio did not treat Plaintiff until August 2002, eight months after Plaintiff's insured status expired (Tr. 25). Had the ALJ rejected Dr. Virtusio's opinion on this basis alone, the ALJ might well have erred, as a treating physician's opinion rendered after the date a claimant's insured status has expired is nevertheless relevant. *See* Boyd v. Heckler, 704 F.2d 1207, 1211 (11th Cir. 1983) (wherein the Eleventh Circuit "adopt[ed] the position of the Second and Seventh Circuits that a treating physician's opinion is still entitled to significant weight notwithstanding that he did not treat the claimant until after the relevant determination date") (citing Dousewicz v. Harris, 646 F.2d 771, 774 (2d Cir. 1981); Stark v. Weinberger, 497 F.2d 1092, 1097 (7th Cir. 1974)).

However, the ALJ additionally noted that the "retrospective" of opinion of Dr. Virtusio was "contradictory" to other evidence of record (Tr. 25), and this statement is supported by the record. Initially, Dr. Virtusio acknowledged in her first sworn statement that Plaintiff's pain was worse "now" (that is, in 2004 (*see* Tr. 234, 255)) than when she first saw Plaintiff in August of 2002, because "he was still able to function [in August 2002] without the pain medication" (Tr. 255).  She also testified in her first sworn statement that Plaintiff's pain worsened after his fall from a fishing pier on May 3, 2003 (*see* Tr. 178, 255–56), and her treatment notes document the severity of Plaintiff's fall and indicate that his pain was significantly worse after the fall (Tr. 178).  In pertinent part, the notes reflect that when Plaintiff fell, he felt as though he had been "electrocuted right up his back," that the fall "really aggravated" Plaintiff's existing back problems, and he had been in a lot of pain since the fall (*id.*).  In her second sworn statement given in January 2006, however, Dr. Virtusio essentially testified that Plaintiff's pain was constant and was the same in 2004 as it was in 2001.  Thus, the ALJ was correct in observing that Dr. Virtusio's sworn statements were inconsistent with each other, as the first noted an increase in Plaintiff's pain in 2003, but the second noted that Plaintiff's pain had always been at the same level of severity.

Additionally, the ALJ noted that Dr. Virtusio's treatment notes were inconsistent with her second sworn statement (which indicated that Plaintiff's pain had been at the same debilitating level all along) (*see* Tr. 25).  As previously noted, Plaintiff's pain worsened after his fall, as documented by Dr. Virtusio's treatment notes dated May 19, 2003 (*see* Tr. 178).  Moreover, after Plaintiff's fall and well after the lapse of his insured status, Dr. Virtusio's treatment notes suggest that not only was Plaintiff's pain worse, it also was apparently not being controlled with medication (*see, e.g.*, Tr. 173 (documenting Plaintiff's complaint in June 2003 of constant and severe pain, which he described as "burning, stabbing, and shooting"), Tr. 170 (Plaintiff's back pain was reported to be the same in July 2003 as in June 2003, and it had now prevented him from sleeping for the previous five days even though he was taking Ambien)).  Whereas, Dr. Virtusio's treatment notes from August 2002, document that Celebrex was helping Plaintiff's pain (Tr. 195).  Thus, the record supports the ALJ's finding that Dr. Virtusio's treatment notes reflect a worsening of Plaintiff's condition from 2001 to 2004, which is inconsistent with Dr. Virtusio's testimony in her second sworn statement that Plaintiff's pain remained at the same level.

Next, the ALJ noted that Dr. Virtusio was a family practitioner, and therefore, her opinion was not entitled to as much weight as of a specialist.   The ALJ did not err in making this observation, as Title 20 C.F.R. § 404.1527(d)(5) provides that "more weight [is given] to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."   The ALJ's observation was especially appropriate in the instant case, as Dr. Virtusio readily admitted that she could not comment on whether surgery would be beneficial for Plaintiff, acknowledging that she was "not a specialist" (Tr. 256).   Moreover, Dr. Virtusio was not rendering an opinion regarding Plaintiff's observable functioning; she was rendering essentially a retrospective diagnosis based on reviewing old treatment notes and radiological studies, both of which are out of her area of "family practice."

Finally, the ALJ correctly noted that Dr. Virtusio based her January 2006 opinion in large part on Dr. Berec's earlier treatment notes (*see* Tr. 325–26), but Dr. Berec's notes do not support Dr. Virtusio's opinion (*see* Tr. 25 (the ALJ actually stated that the earlier records "fl[y] in the face of" Dr. Virtusio's opinion)).   Initially, it should be noted that Dr. Berec saw Plaintiff on only five occasions between July 3, 2001 and September 5, 2001 (*see* Tr. 131–32, 135, 140, 145), which is only a small portion of the time frame significantly relevant to the instant case (that is, from October 1996 through December 2001).   Thus, Dr. Virtusio's opinion (essentially, that Plaintiff was "disabled" on or before December 2001), rendered more than four years after the date Plaintiff was last insured, was based on another physician's notes who had only briefly treated Plaintiff during the relevant time.   The Regulations state that a medical opinion will often be found controlling if it comes from a source with a long-term treating relationship who has a "longitudinal" view of the claimant's limitations, and the opinion is consistent internally and with other evidence, well-supported, well-explained, and/or is from a specialist.   *See* 20 C.F.R. § 404.1527(d) (2007) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").   Here, Dr. Virtusio did not have a treating relationship with Plaintiff during the relevant period, and therefore, did not have a "longitudinal" view of his impairments during the relevant period.   Thus, she had to rely on later studies and visits with Plaintiff, rather than contemporaneous evidence.   Similarly, to the extent she relied on the treatment notes of Dr. Berec to form her opinions, he had only a limited treating relationship with Plaintiff during the relevant time frame.   Furthermore, although Dr.

Berec's notes document Plaintiff's complaints of pain, the ALJ noted that "clinical test results from August 2001, especially when compared to those obtained" from tests taken during the first half of 2003, do not support Dr. Virtusio's opinion (Tr. 25).  Indeed, diagnostic testing during the time of Dr. Berec's treatment does not substantiate a disabling level of pain.  For example, although x-rays of lumbar and cervical spine from July 12, 2001 showed degenerative changes, a thoracic spine x-ray was normal (Tr. 143–44).  However, due to the inferior views of the cervical spine, an MRI was recommended and obtained on August 15, 2001, and it revealed no specific abnormality (Tr. 139, 143).  Additionally, an MRI of the thoracic spine from August 27, 2001 was basically normal (Tr. 134).  Thus, the lumbar spine x-ray results from July 2001 appear to be the most relevant to Plaintiff's complaints of pain, but the specific results of the lumbar spine x-ray are as follows: "[m]inimal anterior wedging of the T12 and L1 vertebral bodies," but no significant intervertebral disc space narrowing (Tr. 143) (emphasis added).[6]  Thus, the ALJ correctly observed that Dr. Berec's treatment notes do not support the rather dire opinion provided by Dr. Virtusio years later. Indeed, Dr. Virtusio appears to have concluded that because Dr. Berec prescribed Methadone for Plaintiff, his pain must have necessarily been severe enough to be debilitating (*see* Tr. 327). Similarly, Dr. Virtusio noted that Dr. Sackheim also prescribed pain medications to Plaintiff (*see* Tr. 329), but pain prescriptions alone do not establish that Plaintiff experienced a debilitating level of pain, especially considering the results of diagnostic testing from the same time the medications were prescribed.  Moreover, a few years later, in August 2002, it was noted that Celebrex, a milder pain medication, was helping Plaintiff's pain.  Additionally, Dr. Sackheim, who saw Plaintiff on only one occasion, recommended cervical epidural steroid blocks, but Plaintiff did not obtain them. *See* Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) ("[T]he ALJ's consideration of Ellison's noncompliance as a factor in discrediting Ellison's allegations of disability is adequately supported . . . ."); *see also* Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir.1988) (refusal to

---

[6]Plaintiff underwent an MRI of the lumbar spine on May 29, 2003, the results of which included multi-level DDD, some narrowing, degenerative facet arthropathy, and annular bulging, but this MRI was taken after Plaintiff's fall from the fishing pier (*see* Tr. 154–55).  Moreover, as noted by the ALJ, when compared to the August 2001 test results, it is clear that Plaintiff's condition had worsened over time.

follow prescribed medical treatment without a good reason will preclude a finding of disability).[7]
Thus, to the extent Dr. Virtusio based her opinion on the records of Dr. Sackheim, her opinion is
inconsistent with those records, in part, because if Plaintiff was in such debilitating pain in
September 2001 as Dr. Virtusio "retrospectively" opined, he would have followed Dr. Sackheim's
recommended course of treatment to relieve his pain.

        Even though relevant and subject to consideration by an ALJ, the retrospective opinion of
a treating physician may nevertheless be rejected if, for example, the opinion is conclusory or
inconsistent with other evidence in the record.  *See* Boyd, 704 F.2d at1211; Wheeler, 784 F.2d at
1075.  Here, the ALJ considered Dr. Virtusio's opinion, noting that it was inconsistent with the
record in numerous respects; he articulated the inconsistencies on which he relied in rejecting her
opinion; and his reasons have substantial support in the record.  Accordingly, the ALJ did not err
in rejecting the opinions of Dr. Virtusio.

        Where substantial record evidence supports the ALJ's decision to discount a treating
physician's opinion, the opinion of a reviewing physician becomes entitled to significant weight.
*See* 20 C.F.R. § 404.1527 (every medical opinion should be evaluated, and unless a treating source's
opinion is given controlling weight, the following factors are considered in deciding the weight to
be given to any medical opinion: examining versus non-examining; treatment relationship, including
length of the treatment relationship, frequency of examination, nature and extent of the treatment
relationship; supportability of the opinion(s); consistency with the record as a whole; specialization;
and "other factors"); Richardson v. Perales, 402 U.S. 389, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)
(report of consultative examiner may constitute substantial evidence supportive of a finding adverse
to a claimant).  Thus, having rejected the opinion of Dr. Virtusio, the ALJ properly considered and
gave credit to the opinion of Dr. Tyler, a board certified orthopedic surgeon (*see* Tr. 300).  Although
Dr. Tyler did not examine Plaintiff, the ALJ was nevertheless required to consider his opinion,
especially here because Plaintiff had only one treating physician during the relevant time frame, Dr.
Berec, but he could not be contacted to provide any additional information (*see* Tr. 165

_____

        [7]Although not mentioned by the ALJ, it is worth noting that Plaintiff reported to Dr. Sackheim, on September
19, 2001, that although he was presently unemployed his normal occupation was that of "construction/painter," and he
was "currently building his own home" (Tr. 273) (emphasis added).  This, too, is inconsistent with one who is
experiencing severe or debilitating pain.

(unsuccessful attempt to obtain Dr. Berec's records), Tr. 281 (noting that Dr. Berec had "left the area")).

Plaintiff, however, contends that the ALJ erred in finding "Dr. Tyler's opinions 'more persuasive' or 'more dispositive' than <u>any other evidence regarding Plaintiff's limitations prior to December 31, 2001</u>," without "articulat[ing] his reasoning for such finding" (Doc. 11 at 19–20) (emphasis added). However, there is no other evidence regarding Plaintiff's condition before December 31, 2001, as Plaintiff sought no medical treatment prior to December 2001, except from Dr. Benec (who made a one-time referral to Dr. Sackheim), and Dr. Benec's records clearly do not establish disability (*see, e.g.*, Tr. 3–4 (a list of medical record exhibits reflecting that the remainder of Plaintiff's treatment occurred from August 2002 forward)). Thus, having properly discounted Dr. Virtusio's opinion, Dr. Tyler's opinion, again, was particularly important, as there were no other opinions to consider regarding the pre-December 2001 time frame. Moreover, given the fact that Dr. Virtusio and Dr. Tyler both rendered retrospective assessments of Plaintiff's pre-2002 functioning, the fact that Dr. Tyler was an orthopedic specialist is of increased importance. Accordingly, the ALJ did not err.

B.      Consideration of Plaintiff's Obesity

Plaintiff contends the ALJ erred in failing to find that his obesity was a "severe" impairment (Doc. 11 at 20–21).  More specifically, Plaintiff contends that although "the ALJ included DDD and osteoarthritis as severe impairments . . ., he did not consider those impairments in combination with the obesity" (*id.* at 21).

At the second step of the sequential-disability determination, the ALJ must "consider the medical severity of [the claimant's] impairments."  Phillips, 357 F.3d at 1237 (quoting 20 C.F.R. § 404.1520(a)(4)(ii)).  In doing so, the ALJ must determine whether the impairments, alone or in combination, "significantly limit" the claimant's "physical or mental ability to do basic work skills." Phillips, 357 F.3d at 1237 (citing 20 C.F.R. § 404.1520(c)).  An impairment should be considered "not severe" only if "it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."  Bridges v. Bowen, 815 F.2d 622, 625 (11th Cir.1987) (citation omitted); *see also* McDaniel v. Bowen, 800 F.2d 1026, 1031 (defining claimant's burden as mild). The burden at step two is on the claimant, Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986), and a diagnosis or a mere showing of "a deviation from purely medical standards of bodily perfection or normality" is insufficient; instead, the claimant must show the effect of the impairment on his ability to work.  McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

Here, according to Plaintiff, his body mass index ("BMI") is 44.9 (see Doc. 11 at 21), which indeed indicates that Plaintiff is obese.  *See, e.g.*, Brown v. Barnhart, 325 F. Supp. 2d 1265, 1271–73 (N.D. Ala. 2004) (finding that a BMI of 30 or greater equates to obesity).  Moreover, the medical records contain numerous references to Plaintiff's obesity (*see, e.g.*, Tr. 173, 178, 274).  Thus, assuming that Plaintiff's weight fell within the applicable definition, his obesity should be considered, among other impairments, because it can cause further degradation of Plaintiff's physical capacity, especially in the presence of certain impairments.  *See* SSR 02-1p.

However, as with the general severity standard, a mere diagnosis of obesity does not equate with a finding of severity.  *See, e.g.*, Wind v. Barnhart, 133 Fed. Appx. 684, 690–91 (11th Cir. 2005) (ALJ correctly determined obesity non-severe because it did not "cause further degradation" of her residual functional capacity).  Similarly, Plaintiff's BMI is not determinative.  *See* SSR 02-1p. Rather, the record must contain evidence demonstrating that Plaintiff's obesity affected his ability

to perform light work activities.  *See id.*; McCruter, 791 F.2d at 1547.  Here, although Plaintiff has established that the medical record documents his obesity, Plaintiff has pointed to no evidence of record, including his own testimony, suggesting that his already reduced capacity for light work was further reduced by his obesity during the relevant period.  In other words, other than Plaintiff's general mention of obesity, BMI, and arthritis, he cites to no evidence of any additional limitation or exacerbation arising from obesity.

Although it might have been better for the ALJ to specifically address Plaintiff's obesity, other courts have found that an ALJ did not err in failing to do so in similar circumstances.  *See* Forte v. Barnhart, 377 F.3d 892, 896–97 (8th Cir. 2004) ("Although his treating doctors noted that Forte was obese and should lose weight, none of them suggested his obesity imposed any additional work-related limitations, and he did not testify that his obesity imposed additional restrictions."). Here, the court has found no indication that any of Plaintiff's physicians suggested that his weight imposed additional work-related restrictions, and Plaintiff has not pointed the court to any such suggestion.  Indeed, Dr. Sackheim noted Plaintiff's obesity on September 19, 2001, but he specifically recommended that Plaintiff exercise (*see* Tr. 272, 274).  Thus, the record suggests that Plaintiff's obesity did not impose any additional restrictions, as his physician — fully aware of Plaintiff's obesity — believed that Plaintiff was capable of physical exercise, which is consistent with a finding that Plaintiff was capable of performing light work.[8]

In sum, because Plaintiff has not demonstrated that obesity reduced his functional capacity, the ALJ properly declined to further consider it as part of his list of Plaintiff's severe impairments.

---

[8]Light work is defined in 20 C.F.R. § 404.1567(b) as follows:
Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

C.        Plaintiff's Subjective Complaints

Plaintiff contends the ALJ erred in rejecting Plaintiff's complaints of pain, which, as the court is well aware, is treated by the Regulations as a symptom of disability.  Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms."  *Accord* 20 C.F.R. § 416.929.  In Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219 (11th Cir. 2002); Kelley v. Apfel, 173 F.3d 814 (11th Cir. 1999); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Martin v. Railroad Retirement Bd., 935 F.2d 230, 233 (11th Cir. 1991).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard."  Wilson, *supra*, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself."  Elam, 921 F.2d at 1216.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence."  Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987)).  However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered.  *Id.*; Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true."  MacGregor, 786 at

1054; <u>Holt</u>, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole."  <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted).  The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence.  <u>Jones v. Department of Health and Human Services</u>, 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the <u>Hand</u> standard is the need for a credibility determination concerning a plaintiff's complaints of pain.  Those complaints are, after all, subjective.  "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain."  <u>Scharlow v. Schweiker</u>, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[9]  People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others.  "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ."  <u>Hand, supra,</u> at 1548-49.  It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence."  <u>Arnold v. Heckler</u>, 732 F.2d 881, 884  (11th Cir. 1984).   Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

In the instant case, the ALJ found that Plaintiff's statements concerning chronic debilitating pain and other symptoms affecting his functioning were not credible to the extent he described, for reasons that can be summarized as follows:  1) Plaintiff received little treatment at the time his

---

[9]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  <u>Bonner v. Pritchard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

insured status expired or immediately thereafter, 2) a disparity existed between the alleged intensity of the symptoms and the clinical tests, 3) the record did not document reliable manifestations of a disabling loss due to pain, and 4) conservative outpatient treatment in August 2002 alleviated many of Plaintiff's symptoms (Tr. 27).

As to the ALJ's first statement, the record clearly demonstrates that Plaintiff sought very little treatment during the most relevant time frame (approximately five years), from October 1996 to December 2001.  Indeed, as previously noted, the record substantiates, during the relevant time, only five office visits with Dr. Berec during a two-month period in 2001, and one referral to Dr. Sackheim.  Plaintiff sought no additional treatment until August of 2002.  A claimant's failure to seek treatment is a proper factor for the ALJ to consider.  *See* Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984) (in addition to objective medical evidence, it is proper for ALJ to consider use of painkillers, failure to seek treatment, daily activities, conflicting statements, and demeanor at the hearing); Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995) (failure to seek medical treatment for a long time during a claimed period of disability tends to indicate tolerable pain).  Plaintiff has attempted to explain his lack treatment by testifying that he did not see any physicians prior to 2001 because he "did not like going to the doctor" (Tr. 406).  He testified that he had a bad experience as a child during a spinal tap procedure, and as a result he developed a fear of physicians (*id.*).  However, as alluded to by the ALJ, Plaintiff's testimony is belied by the fact that he saw numerous physicians from 2002 forward (*see* Tr. 25).

Next, as to the ALJ's observation that a disparity existed between the alleged intensity of Plaintiff's symptoms and the clinical tests, the undersigned has previously described the results of Plaintiff's MRIs and x-rays taken prior to December 2001, which showed only minor abnormalities and the lack of any significant pathology.  Although objective medical evidence is not always required to confirm the severity of alleged pain (because, alternatively, a plaintiff can establish that an objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain), *see* Hand, 761 at 1549, it was proper for the ALJ to note the lack of corroborating clinical tests during the relevant time — especially when compared with Plaintiff's later test results.  The ALJ found it relevant that Plaintiff's condition worsened after the expiration of his insured status, and that Plaintiff then sought increased care and stronger medications (Tr. 24).

As the ALJ noted, such an increase in care reasonably supports a view that Plaintiff's condition was not as severe as he claimed during his insured period (*see* Tr. 25, 27).

Third, the ALJ noted that the "record does not document reliable manifestations of a disabling loss of functional capacity by [Plaintiff] secondary to such symptoms" (Tr. 27). Although the ALJ did not elaborate on this point, a review of the record reveals two medical opinions regarding Plaintiff's functional capacities during the relevant time, those of Dr. Tyler and Dr. Virtusio, and as previously discussed, the ALJ chose to accept the opinions of Dr. Tyler over those of Dr. Virtusio. However, the record also contains the opinions of the lay witnesses who testified at Plaintiff's supplemental hearing regarding his pain and functional limitations. The ALJ summarized their testimony in his opinion and noted at least one contradiction between their testimony and that of Plaintiff's (*see* Tr. 18). The ALJ then found that their testimony was not fully credible, in part, because Plaintiff failed to report the same level of incapacitating pain to his physicians "in early calendar year 2003 regarding injuries to his back" (Tr. 18). This statement of the ALJ is not entirely clear to the undersigned, as the ALJ did not identify the physicians to whom he was referring. However, a review of the record reveals that Plaintiff saw Dr. Virtusio during the first part of 2003, and one of her records, dated March 20, 2003, reflects that Plaintiff reported severe lower back pain and rated it at a ten on a ten-point scale (Tr. 188). Thus, this unclear statement of the ALJ does not appear to be supported by the record. However, it is important to note that the first half of 2003 is well beyond Plaintiff's date last insured. Moreover, the consideration of lay testimony is different from that of a claimant's testimony.

While noting the ambiguous nature of the Commissioner's regulations regarding the consideration of lay testimony, the Eleventh Circuit has recently explained that "ALJs should consider all available evidence, including nonmedical evidence, such as information from parents and teachers." Shinn ex rel. Shinn v. Comm'r of Social Sec., 391 F.3d 1276, 1283–85 (11th Cir. 2004) (referencing 20 C.F.R. §§ 416.924a(a), 416.929(a)). However, the ALJ is not required to accept such testimony as true. Like other evidence it should be considered, but it can be rejected. Here, it is clear the ALJ considered, and rejected, the testimony of Plaintiff's lay witnesses. Although his statement regarding the first half of 2003 is ambiguous, the ALJ later referred to the testimony of Plaintiff's lay witnesses, in the same sentence where he stated "the fact remains no treatment was documented between September 2001 and August 2002." Thus, it is clear that the

ALJ found that Plaintiff's lack of treatment during the relevant time frame called into question the accuracy of the testimony provided by his friend and family.  However, even if the ALJ had erred in his consideration of the testimony of Plaintiff's lay witnesses, the court is not required to accept their testimony as true.  *Cf.* MacGregor, 786 at 1054 ("[i]f the Commissioner refuses to credit [subjective testimony <u>of the plaintiff</u> concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true.") (emphasis added).  Moreover, the other reasons provided by the ALJ for discounting Plaintiff's subjective complaints of pain are fully supported by the record.

Fourth, the ALJ noted that Plaintiff's "conservative outpatient treatment in August 2002 with prescribed anti-inflammatory medication successfully alleviated many of [Plaintiff's] symptoms" (Tr. 27).  Indeed, Dr. Virtusio noted in August of 2002 that Celebrex was helping Plaintiff's pain (Tr. 195).  "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling."  <u>Dawkins</u>, 848 F.2d at 1213 (citation omitted).  Additionally, Dr. Berec's records from July to September 2001 reflect conservative treatment in the form of medication only (*see, e.g.*, Tr. 133, 136, 140, 146).  An ALJ may properly consider treatment that is "entirely conservative in nature" in discrediting a claimant's testimony.  <u>Wolfe v. Chater</u>, 86 F.3d 1072, 1078 (11th Cir. 1996).

In conclusion, the court notes that Plaintiff, in large part, dismisses the ALJ's discussion of his credibility based on his own view of the evidence.  For example, he refers to his hearing testimony to support his claim that he has not sought treatment only because he is afraid of doctors (*see* Doc. 11 at 23–24).  But the question is not whether the evidence could support Plaintiff's alternative view of the facts.  The relevant inquiry is whether the ALJ's decision is supported by substantial evidence.  Here, the ALJ articulated the inconsistencies on which he relied in discrediting Plaintiff's subjective complaints of pain, and his findings are supported by substantial evidence on the record as a whole; therefore, the ALJ's credibility finding should be affirmed.  *See* <u>Foote</u>, 67 F.3d at 1561–62.  A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court.  *See id.*

D.      Testimony of the Vocational Expert

As Plaintiff's last ground for relief he contends the ALJ erred by failing to include the limitations of Dr. Virtusio and Plaintiff's lay witnesses in the hypothetical questions posed to the VE (Doc. 11 at 24–25).

As the court is well aware, a hypothetical question must comprehensively describe the plaintiff's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence.   Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).  However, the ALJ is not required to include findings in the hypothetical that he has properly rejected as unsupported.  *See* McSwain v. Bowen, 814 F.2d 617, 620 n.2 (11th Cir. 1987). Here, as the ALJ properly discounted the opinions of Dr. Virtusio and the lay witnesses, he was not required to include their opinions in the hypothetical questions of the VE.  Thus, the ALJ did not err in this regard.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at 1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 1st day of April 2008.


*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**